**HEARTLINE FARMS, INC., Appellant,**

v.

**John DALY, etc., Appellee.**

**No. CV90-L-236.**

United States District Court,
D. Nebraska.

Sept. 24, 1990.

Vard R. Johnson of Broom, Johnson, Fahey & Clarkson, Omaha, Neb., for appellant.

Daniel A. Fullner of Moyer, Moyer, Egley, Fullner & Warnemunde, Madison, Neb., for appellee.

## MEMORANDUM OF APPEAL FROM THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF NEBRASKA

URBOM, District Judge.

Heartline Farms, Inc. (Heartline), a debtor in Chapter 12 farm reorganization proceedings before the United States Bankruptcy Court for the District of Nebraska, Minahan, J., 116 B.R. 700, was an assignee of a vendee's interest in a land sales installment contract (the contract), the vendor being the estate of Frank and Agnes Stokes (the Stokes estate), represented by John Daly. The Stokes estate asserted that the contract was executory under 11 U.S.C. § 365 of the Bankruptcy Code and, therefore, must be assumed or rejected by the debtor. The bankruptcy court determined that the debtor could not assume the contract and, therefore, it could be strictly foreclosed under Nebraska law because the vendee had no equity in the property and justice and equity would not be offended

by strict foreclosure. Under such circumstances, the bankruptcy court held, an installment land contract is executory.

For the reasons set forth herein, I find that under Nebraska law and the Bankruptcy Code this particular contract is not executory and must be treated and appropriately foreclosed as a security device.

## FACTS

The Stokes estate sold 1,680 acres of Nebraska farm land to Beverly Land Co. for $504,000 in 1978. Through a series of assignments ending in 1984, the land came into the physical possession of Charles W. Raymond, although Raymond had obtained a warranty deed to the property in 1978. In 1988, Raymond defaulted on payments to be made to the Stokes estate. A settlement agreement delaying foreclosure and giving Raymond until October 16, 1987, to pay the Stokes estate $275,000 was reached in August, 1987. On October 13, 1987, Raymond conveyed the land to Heartline by warranty deed. All outstanding stock in Heartline was owned by Raymond and his family. On October 16, 1987, Raymond failed to pay the amount due under the settlement agreement and the Stokes estate initiated judicial foreclosure proceedings on September 1, 1988, treating the contract as a security device, not dissimilar to a mortgage. Raymond filed for bankruptcy under Chapter 12 on December 16, 1988, and the Stokes estate filed a proof of claim in the amount of $310,740.66 in principal and $22,466.97 in interest. There is no disagreement that the contract had been paid down by almost $200,000.

Heartline filed for bankruptcy under Chapter 12 on March 16, 1989. Its reorganization plan valued the land at $260,000, with a total outstanding debt of approximately $361,693.30. Past due real estate taxes amounted to $67,016.96. Heartline admittedly has no equity in the land, and has made no payments since October 1987.

I have appellate jurisdiction of this case under 28 U.S.C. § 158(a) and Bankruptcy Rules 8001 and 8002.

## DISCUSSION

### I. Nebraska Installment Land Contracts

■ The most logical place to begin this review is with a definition of the installment land contract, also called an installment land sales contract, or contract for deed.

The installment land contract is a form of security transaction between a vendor and a vendee in which the vendor covenants to convey title to described real property upon the vendee's payment of a specified amount of money and successful performance of the other obligations set forth in the contract.... Upon execution of the contract, the vendor retains legal title as a security interest in the land, whereas equitable title vests with the purchaser, who is allowed to be in possession of the property while making payments. The contract usually stipulates that "time is of the essence" and provides that upon the purchaser's default in making payments or in performing any of the other covenants, the seller may declare forfeiture, terminate all rights of the purchaser, and retain all payments made on the contract as liquidated damages.

Comment, *Installment Land Contracts: Remedies in Nebraska*, 60 Neb.L.Rev. 750, 751–52 (1981) (hereinafter referred to as Comment).

Case law also supports the definition of an installment land contract as a form of security device, as the doctrine of equitable conversion is applicable in Nebraska.

It has been frequently and consistently decided by this court, as it is quite unanimously agreed by courts generally, that if the owner of real estate enters into a contract of sale whereby the purchaser agrees to buy and the owner agrees to sell it and the vendor retains the legal title until the purchase money or some part of it is paid, the ownership of the real estate as such passes to and vests in the purchaser, and that from the date of the contract the vendor holds the legal title as security for a debt as trustee for the purchaser. The interest or estate

acquired by the vendee is land and the rights conferred by the contract upon and vested in the vendor are personal property.

*Ehlers v. Vinal*, 382 F.2d 58, 62 (8th Cir. 1967), citing *Buford v. Dahlke*, 158 Neb. 39, 42–43, 62 N.W.2d 252, 254–55 (1954). The Nebraska Supreme Court also currently views installment land contracts as security devices. *Comment*, at 789. They are recognized as different from mortgages and, upon default, attempts are made to fashion equitable solutions. *Id.*

Furthermore, the Nebraska Revised Statutes, while not specifically identifying an installment land contract as such, recognizes its substance in the form of an executory contract.

(1) The words real property, real estate, and lands, shall include all property, a conveyance whereof may be recorded by a register of deeds or county clerk under existing laws; (2) the word mortgage shall mean any instrument creating or evidencing a lien or any kind on such property given or taken as security for a debt; and (3) an executory contract for the sale of land under which the vendee is entitled to or does take possession thereof shall be deemed a mortgage of the land for the unpaid balance of the purchase price.

*Neb.Rev.Stat.*, § 77–1401 (Reissue of 1990).

Subsection three of § 77–1401 is essentially a codification of the doctrine of equitable conversion as applied to installment land contracts. An executory contract that has all the characteristics of an installment land sale contract will be deemed a mortgage which, in reference to section two, is a security device. For over a century, the law in Nebraska has been that "where the parties enter into an executory contract for the sale of real estate, even though title has not passed, the vendor, upon default by the vendee, may treat the contract as an ordinary real estate mortgage and foreclose it as such." *Jones v. Burr*, 223 Neb. 291, 294, 389 N.W.2d 289, 292 (1986). See also *Ryan v. Kolterman*, 215 Neb. 355, 338 N.W.2d 747 (1983), *Hendrix v. Barker*, 49 Neb. 369, 68 N.W. 531 (1896). Courts have

subsequently applied the theory of equitable conversion to the installment land sales contract and recognized it as a security device to which equitable principles apply. *Comment*, at 756.

The State of Nebraska is not alone in finding the essence of an installment land sales contract to be a security device. In Minnesota, a contract for deed is not a contract for the sale of real property, but rather a financing instrument for a sale that has already occurred. *In re Adolphsen*, 38 B.R. 776, 778 (Bktcy.D.Minn. 1983), aff'd, *In re Adolphsen*, 38 B.R. 780 (U.S.D.C., D.Minn. Third Div.1983). The vendee has all the incidents of ownership except legal title, is an equitable owner, is in possession, must pay taxes and assessments, and maintain the property. *Id.* at 778. The vendee's interest in the contract for deed is not executory. *Id.* The *Adolphsen* court noted *In re Booth*, 19 B.R. 53 (Bkrtcy.D.Utah 1982), which held that (1) "treating the contract like a lien held by a secured party enabled the debtor to accede to any equity which had been built up in the property," (2) "it furthered the rehabilitation of the debtor by enabling him to sell it free and clear of the lien or to structure it into a plan," and (3) "treating a vendee-debtor's contract for deed as a lien avoided unfairly encumbering the debtor with the costs of assuming an executory contract." *Id.* at 778–79.

Also of note is the state of Ohio which has enacted legislation specifically governing installment land contracts. *In re Kratz*, 96 B.R. 127, 129 (Bkrtcy.S.D.Ohio, E.D.1988). Ohio Rev.Code Ann. § 5313.01 *et seq.* defines the term and requires that every installment land contract conform to the formalities required for the execution of a deed or mortgage, and that if the vendee has paid a sum equal to, or in excess of 20% of the purchase price, or has paid in accordance with the terms of the agreement for five years, the vendor may recover possession of the property only by foreclosure and judicial sale. *Id.* Statutes, cases, and law review articles notwithstanding, "[c]ourts continue to experience difficulty in determining whether an installment land contract should be deemed an

'executory contract' in a vendee bankruptcy setting...." Nelson and Whitman, *Real Estate Transfer, Finance, and Development*, 735, 3d ed., West Publishing Co., 1987. "If bankruptcy courts uniformly take the *In re Booth* approach, it may hasten the day when installment land contracts are uniformly treated as mortgages for all purposes, a result which we would generally applaud." *Id.*[1]

## II. *11 U.S.C. § 365 of the Bankruptcy Code*

### A. The Nature of Executory Contracts

Under § 365 of the Bankruptcy Code, a debtor in possession has all the rights and powers of a trustee. *In re Adolphsen*, 38 B.R. at 778. Section 365 states that the trustee, subject to the court's approval, may assume or reject any executory contract of the debtor. 11 U.S.C. § 365(a). Section 365 provides no definition of "executory contract," but the legislative history "indicates that the term refers to a contract on which performance remains due to some extent on both sides." *In re Adolphsen*, 38 B.R. at 778. An example given of a non-executory contract is a promissory note. *Id.*, S.Rep. No. 95–989, 95th Cong., 2d Sess. 58–60 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787, 5844. The absence of a clear definition of "executory contract" has no doubt contributed to the varied and numerous interpretations under the Bankruptcy Code that have arisen. Classification of an installment land contract as either an executory contract or a security device will have significant consequences for the debtor in bankruptcy, one of which is that, if the contract be executory, the purchaser must assume or reject it, each with its own results. 11 U.S.C. § 365(d)(2).

### B. The Controversy Surrounding 11 U.S.C. § 365

The Eighth Circuit has adopted the following limited definition of an executory contract in the context of the Bankruptcy Act: "a contract under which the obligation of both the bankrupt and the other party to the contract are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other. V. Countryman, *Executory Contracts in Bankruptcy: Part I*, 57 Minn.L.Rev. 439, 460 (1973)." *In re Knutson*, 563 F.2d 916, 917 (8th Cir.1977). This definition, however, is not without its problems and criticism.

Professor Countryman, in developing his definition of executory contract, relied on cases that did not involve installment contracts but, rather, involved only earnest money or option agreements, neither of which divide the incidents of ownership, i.e., legal and equitable titles. *In re Hardie*, 100 B.R. 284, 286, n. 3 (Bkrtcy.E.D.N.C.1989), citing *In re McDaniel*, 89 B.R. at 863–64. Taken literally, the definition provided in the legislative history of § 365, which is Countryman's definition, "would render almost all agreements executory since it is the rare agreement that does not involve unperformed obligations on either side." *In re Streets & Beard Farm Partnership*, 882 F.2d 233, 235 (7th Cir.1989). The Seventh Circuit concluded that Professor Countryman's definition should not negate the intent of Congress, and believed that "Congress intended § 365 to apply to contracts where significant unperformed obligations remain on both sides." *Id.* In *In re Streets & Beard Farm Partnership*, the debtor took immediate possession of the property upon entry into the contract and was liable for all taxes and costs; the only remaining obligation of the vendor was to deliver legal title upon final payment by vendee. *Id.* "[D]elivery of a legal title is a mere formality and does not represent the kind of significant legal obligation that would render the contract executory," the court said. *Id.* Rather, this was a security agreement in which vendor held legal title in trust as security for payment of the purchase price, and securi-

---

1. For a nonexhaustive list of cases in which real estate installment contracts have been found to be executory contracts or security devices, see *In re McDaniel*, 89 B.R. 861, 870, n. 5 (Bkrtcy.E.D.Wash.1988).

ty agreements are not executory contracts under § 365. *Id.*

■ A further consideration is whether § 365 of the Bankruptcy Code can be interpreted to override state law. Again, this is not a new question for courts, but disagreement has arisen. A bankruptcy court has only the powers and jurisdiction expressly or necessarily implied by Congress. *Johnson v. First National Bank of Montevideo, Minnesota,* 719 F.2d 270, 273 (8th Cir.1983), *cert. denied,* 465 U.S. 1012, 104 S.Ct. 1015, 79 L.Ed.2d 245 (1984). Even though it is essentially a court of equity, such powers can only be exercised consistent with the Bankruptcy Code, and are not unlimited, especially where property rights created and defined by state law are involved. *Id.* "[I]n the absence of any conflict between the state and bankruptcy laws, the law of the state where the property is situated governs questions of property rights." *Id.,* citing *Stellwagen v. Clum,* 245 U.S. 605, 38 S.Ct. 215, 62 L.Ed. 507 (1918). See also, *Butner v. U.S.,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). "[A] bankruptcy court may not exercise its equitable powers to create substantive rights which do not exist under state law." *Johnson,* 719 F.2d at 274. The Supreme Court, in *Butner,* clearly explained the nature of this concept based on federalism when it stated:

> "Property interests are created and defined by state law. Unless some federal interest requires a different result, there is no reason why such interests should be analyzed differently simply because an interested party is involved in a bankruptcy proceeding. Uniform treatment of property interests by both state and federal courts within a State serves to reduce uncertainty, to discourage forum shopping, and to prevent a party from receiving a 'windfall merely by reason of the happenstance of bankruptcy.'" *Butner,* 440 U.S. at 55, 99 S.Ct. at 918 quoting *Lewis v. Mfrs. Nat'l Bank,* 364 U.S. 603, 609, 81 S.Ct. 347, 350, 5 L.Ed.2d 323 (1961).

It has also been suggested that Chapter 12, in text or purpose, does not negate the applicability of § 365. While I have found no language in Chapter 12 specifically stating that installment land contracts are executory contracts under § 365, I do note that several courts have looked to 11 U.S.C. §§ 365(i) and (j) as proof that the Bankruptcy Code intended implicitly to recognize installment land contracts as executory contracts. I believe that conclusion to be in error, as it has been noted that sections 365(i) and (j) were drafted in response to a perceived injustice in the decision in *In re New York Investors Mutual Group,* 143 F.Supp. 51 (S.D.N.Y.1956). *In re Kratz,* 96 B.R. 127, 131 (Bkrtcy.S.D.Ohio 1988). See also, *In re Booth,* 19 B.R. at 55–56, 61–63, n. 19. "[D]espite the existence of these provisions, § 365 does not require that installment land contracts be treated as executory contracts if that is contrary to state law...." *In re Kratz,* 96 B.R. at 131.

■ The critical factor to consider in deciding if § 365 even comes into play is the particular state's laws classifying installment land sales contracts as either executory contracts or security devices. State law controls insofar as it does not conflict with the provisions of the Bankruptcy Act. The basic tenets of federalism allow a state to protect interests in its land as it sees fit. Only if a state chooses to recognize an installment land sale contract as an executory contract should § 365 come into play under Chapter 12. Where state law interprets an installment land sales contract to be a form of security device, § 365 is not a concern.

Therefore, (1) recognizing Professor Countryman's definition, with it's basis in noninstallment contract cases involving earnest money and option contracts, neither of which involve the division of the incidents of ownership, *i.e.,* legal and equitable title, (2) also recognizing that courts nationwide do not agree on whether such a contract is executory under § 365, and (3) acknowledging that state law controls the classification of installment land contracts under Chapter 12, I find no compelling reasons to treat this Nebraska installment land contract as executory under § 365.

I note that the Eighth Circuit has twice ruled that installment land sales contracts should be classified as executory contracts, but neither case in question applied Nebraska law. See, *In re Carver*, 61 B.R. 824 (Bktcy.D.S.D.1986), *rev'd*, 71 B.R. 20 (D.S.D.W.D.1986) and *In re Speck*, 50 B.R. 307 (Bkrtcy.D.S.D.1985), *aff'd*, 62 B.R. 61 (D.S.D.C.D.1985), *aff'd*, 798 F.2d 279 (8th Cir. 1986) (in both cases the Eighth Circuit deferred to the district court's interpretation of state law in an analysis of 11 U.S.C. § 365). State law determines whether a given interest is to be classified as a lien or an executory contract. *Brown v. First National Bank in Lenox*, 844 F.2d 580, 581 (8th Cir.1988). In *Brown*, the debtors "presented no solid reason why we should depart from our normal practice of deferring to the view of a district court on the law of its own state...." *Id.*

### III. *Chapter 12*

Chapter 12 was enacted for a very specific purpose, namely, to assist the family farmer who, after being encouraged by federal programs to increase acreage and production in the 1970s, suffered as a result of the dramatic devaluation in farm land in the 1980s. Congress, in enacting Chapter 12, noted that:

"Under current law, family farmers in need of financial rehabilitation may proceed under either Chapter 11 or Chapter 13 of the Bankruptcy Code. Most family farmers have too much debt to qualify as debtors under Chapter 13 and are thus limited to relief under Chapter 11. Unfortunately, many family farmers have found Chapter 11 needlessly complicated, unduly time-consuming, inordinately expensive and, in too many cases, unworkable.

Accordingly, this subtitle creates a new chapter of the Code—Chapter 12—to be used only by family farmers. It is designed to give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land."

H.R.Conf.Rep. No. 99–958, 99th Cong., 2d Sess., *reprinted in* 1986 U.S.Code Cong. & Admin.News 5227, 5246, 5249.

At the heart of Chapter 12 is the reorganization plan, in which an insolvent debtor can write down debt to the value of assets (net of exemptions), and also write down interest rates, in an attempt to discharge loan deficiencies. Aiken, *Chapter 12 Family Farmer Bankruptcy*, 66 Neb.L.Rev. 632, 680 (1987). "Chapter 12 has revolutionized farm bankruptcies and indirectly farm credit workout negotiations. Prior to Chapter 12, Chapter 11 reorganization was not a realistic option for farmers.... Unless the farmer could qualify for Chapter 13, he had little realistic likelihood of a successful bankruptcy reorganization." *Id.* at 693.

Successful bankruptcy reorganization is certainly a prime consideration under the Code. In this case, a family farmer who is a debtor-in-possession of over 1,600 acres of farm land filed for bankruptcy under Chapter 12. There has been no dispute that the debtor meets the strict requirements for filing under Chapter 12. Rather, the issues before me deal with whether the Bankruptcy Court erred as a matter of law in holding (1) that the installment land contract was executory, (2) that the lack of substantial equity in the property resulted in the contract being designated as executory, and (3) that justice and equity would not be offended by ordering strict foreclosure of the contract.

As to the first issue, I find that the installment land contract was not executory, but rather a security device under Nebraska law. On the second issue, I find that the purpose Congress had in mind in enacting Chapter 12, namely, assistance to family farmers uniquely caught in the depression of farm land prices, would be defeated if the degree of equity were to be the deciding factor in whether their installment land contracts were classified as executory contracts or security devices. Such a test does not provide the clear guidance necessary to navigate a sinking farm through Chapter 12. Without legislative guidance, this test leaves me with no clear method to determine what level of equity is required to change the status of an installment land contract from executory contract

to security device. The vendee has argued that he has paid approximately 40% of the 1978 contract price of $504,000. Since then, the value of the land has plummeted to $260,000, according to the vendee's 1989 reorganization plan. Approximately $200,-000 in improvements were made to the land which, in 1978, was nothing but grass land. It is exactly this type of situation that Chapter 12 was enacted to assist.

"If the chapter 12 debtor is insolvent, has no unencumbered nonexempt property, and has no equity in encumbered property, the liquidated value of unsecured claims will be zero. Many, if not most, chapter 12 plans will be 'zero plans' in that unsecured claims will have no liquidation value and the plan will propose no payment to unsecured claim holders." *Id.* at 692. I cannot read the provisions of Chapter 12, which incorporate 11 U.S.C. § 365, in a manner that would defeat the stated purpose of Chapter 12. I also agree with the *Adolphsen* court which stated that "bankruptcy courts should not be bound by static definitions of what is an executory contract, but should strive to satisfy the purposes of the Act in conjunction with the goals of the debtor (or trustee), in order that equity may be served." *In re Adolphsen*, 38 B.R. at 779.

IV. *Strict Foreclosure in Nebraska*

■ The third issue before me is whether justice and equity would be offended by allowing strict foreclosure of the property. Nebraska law dictates the conditions where strict foreclosure is proper. Strict foreclosure of land contracts cannot be resorted to in all cases. *Harrington v. Birdsall*, 38 Neb. 176, 186, 56 N.W. 961, 964 (1893). The remedy is a harsh one, and courts of equity will only decree a strict foreclosure under peculiar and special circumstances. *Id.* "If the vendee or purchaser has not been guilty of gross laches, nor unreasonably negligent in performing the contract, a strict foreclosure should be refused, on the ground that it would be unjust, even though the vendee may have been slightly in default in making of a payment." *Id.* "So, for the same reason, a strict foreclosure will be denied where the premises

have greatly increased in value since the sale, or where the amount of unpaid purchase money is much less than the value of the property." *Id.*

The Nebraska Supreme Court has followed the majority trend in decreeing strict foreclosure "only under peculiar and special circumstances." Comment, at 766. Strict foreclosure actions are allowed "only when in the sound discretion of the court it would be inequitable or unjust to refuse them." *Id.* "In determining the vendee's equity in the property, the court will consider the vendee's payments to the vendor and the vendee's expenditures for property improvements. Other relationships between the parties may be considered as well." *Id.* at 769.

■ The parties in this case have had contractual relations for over a decade, and the vendee personally helped to develop the grass land into farm land, and to make improvements. Before the land sharply depreciated in value, the vendee paid off a substantial portion of the contract. It was the devaluation that consumed the equity built up in the property, and not any fault of the vendee. While I cannot deny that presently there is no equity in the property, I can and do reject the conclusion of the bankruptcy court that equity and justice would not be offended by allowing strict foreclosure.

CONCLUSION

Equity and justice become obscure where black letter law is applied literally with the effect of minimizing or even defeating underlying policies. Declaring the debtor's contract to be executory, and ordering strict foreclosure of the property, in this case, would work an injustice upon the debtor, defeat the purpose of Chapter 12, and offend equity and justice. I find that under Nebraska law, the appellant's installment land contract is a form of security device requiring judicial foreclosure.

ORDER ON APPEAL

In accordance with today's memorandum,

IT IS ORDERED that the order of Judge John C. Minahan, Jr., of May 4, 1990, is reversed and the case is remanded to the bankruptcy court for action in accordance with today's memorandum.